IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAGDA BAYRON LUGO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 20-1060-SRF |
| | ) |
| KILOLO KIJAKAZI,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant, | ) |
| | ) |

## MEMORANDUM OPINION[2]

Plaintiff Magda Bayron Lugo ("Lugo") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on August 11, 2020 against the defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration (the "Commissioner"). (D.I. 2) Lugo seeks judicial review of the Commissioner's February 25, 2019 final decision denying Lugo's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–433, 1381-1383f. Currently before the court are cross-motions for summary judgment filed by Lugo and the Commissioner.[3] (D.I. 20; D.I. 23) For the reasons set forth below, I recommend that the court DENY Lugo's

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi is substituted as Defendant in place of Andrew Saul.
[2] The parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this matter through final judgment, and the case was assigned to the undersigned judicial officer on September 20, 2021. (D.I. 27)
[3] The briefing for the present motions is as follows: Lugo's opening brief (D.I. 21), the Commissioner's combined opening brief in support of the motion for summary judgment and answering brief in opposition to Lugo's motion (D.I. 24), and Lugo's combined answering and reply brief (D.I. 25).

motion for summary judgment (D.I. 20), and GRANT the Commissioner's cross-motion for summary judgment (D.I. 23).

I.  **BACKGROUND**

   **A. Procedural History**

   Lugo protectively filed applications for DIB and SSI in April 2015, alleging a disability onset date of June 6, 2014 due to a herniated disc, anxiety, panic attacks, depression, arthritis, diabetes, high blood pressure, and sleep apnea. (D.I. 18 at 143, 231-39) Lugo's claims were denied initially in April 2016 and upon reconsideration in February 2017. (*Id.* at 141-47) At Lugo's request, an administrative law judge ("ALJ") held a hearing on February 6, 2019. (*Id.* at 50-76)

   During the hearing, Lugo amended her alleged disability onset date to June 7, 2016. (*Id.* at 53-55) Lugo's date last insured for purposes of her DIB application was December 31, 2018. (D.I. 18 at 267) Thus, Lugo must establish her disability on or before that date to be entitled to benefits. The ALJ issued an unfavorable decision on February 25, 2019, finding that Lugo was capable of a reduced range of light work. (D.I. 18 at 28-41) The Appeals Council subsequently denied Lugo's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 7-9)

   Lugo brought this civil action challenging the ALJ's decision on August 11, 2020. (D.I. 2) Lugo filed her pending motion for summary judgment on June 6, 2021 (D.I. 20), and the Commissioner cross-moved for summary judgment on August 2, 2021 (D.I. 23). Briefing is now complete on the pending motions.

   **B. Medical History**

   Lugo was 52 years old on the date of her hearing before the ALJ in February 2019. (D.I.

2

18 at 56) Lugo has a twelfth-grade education and has past relevant work as a housekeeping manager. (*Id.* at 57, 59-60) The ALJ found that Lugo had the following severe impairments: degenerative disc disease of the lumbar spine; obesity; major depressive disorder; and generalized anxiety disorder. (*Id.* at 30) Lugo challenges the ALJ's assessment of her low back pain and diagnosis of fibromyalgia. (D.I. 21 at 11-18) Because Lugo does not challenge the ALJ's conclusions regarding the balance of her impairments, including her mental impairments, the court does not address those conditions here.

### 1. Medical evidence

Lugo's medical records document a history of lower back pain beginning in 2014. An X-ray of Lugo's lumbar spine in June 2014 showed moderate degenerative changes in her right hip, as well as disc space narrowing and spurring in her lumbar vertebrae. (D.I. 18-1 at 56) An August 2014 MRI revealed mild disc space narrowing and disc protrusion at the L4-5 level and bilateral mild facet arthritis at the L4-5 and L5-S1 levels. (*Id.* at 65) During this time, Lugo treated with Carol Alvarado, M.D., an internist, who diagnosed Lugo with fibromyalgia, among other conditions. (*Id.* at 51-55, 60-64) Dr. Alvarado treated Lugo's back symptoms by prescribing a pain reliever, a muscle relaxant, and nerve pain medication. (*Id.*) Lugo also began attending physical therapy in July 2014 to improve her strength, flexibility, and range of motion. (*Id.* at 58-59, 538-49)

In September 2015, Lugo began seeing Neeraj Kapur, M.D., a pain management specialist, for low back and leg pain. (D.I. 18-1 at 184-87, 191) Dr. Kapur noted that Lugo experienced no side effects from ibuprofen, Neurontin, and Flexeril, but her pain level remained a 9 out of 10, and physical therapy likewise failed to provide long-term relief. (*Id.* at 187) On examination, Dr. Kapur described Lugo's bilateral positive straight leg raise test results in both a

3

seated and reclining position and observed that Lugo experienced pain in response to extension and rotation of the spine. (*Id.*) However, Lugo exhibited intact sensation and full strength in her extremities. (*Id.*) Dr. Kapur diagnosed Lugo with lumbar radiculopathy, intervertebral disc disorder, and spondylosis with myelopathy. (*Id.* at 185) Lugo underwent epidural nerve block injections in September and October 2015, which reduced her pain temporarily. (*Id.* at 148, 157, 195, 200) Dr. Kapur's findings remained largely consistent through the beginning of 2016. (*Id.* at 205, 210)

Lugo began treating with Bikash Bose, M.D., a neurosurgeon, in February 2016. (D.I. 18-1 at 215-16) Dr. Bose noted positive bilateral straight leg testing and slightly reduced strength in Lugo's lower extremities, and he advised Lugo to obtain updated imaging studies. (*Id.* at 216) Lugo's EMG results the following month were normal, but a bone scan showed increased degenerative and arthritic changes. (*Id.* at 225) In April 2016, Lugo underwent an MRI scan which showed mild findings of degenerative disc disease and stable mild lumbar spondylosis with left foraminal disc protrusion. (*Id.* at 267) Upon reviewing the test results, Dr. Bose recommended right sacroiliac ("SI") joint injections and a provocative lumbar discography to identify the source of the pain. (*Id.* at 263)

Dr. Kapur administered the SI joint injection on May 23, 2016. (D.I. 18-2 at 179) Treatment notes from Dr. Kapur during this time period were largely consistent with his earlier treatment notes, with an added diagnosis of sacroiliitis.[4] (*Id.* at 177-78, 180-81) Lugo was also evaluated by Sheerin Javed, M.D., a rheumatologist, in May 2016. (D.I. 18-1 at 312-14) An

---

[4] Sacroiliitis is defined as "an inflammation of one or both of your sacroiliac joints – situated where your lower spine and pelvis connect," causing pain in the buttocks or lower back that can extend down one or both legs. *See* https://www.mayoclinic.org/diseases-conditions/sacroiliitis/symptoms-causes/syc-20350747.

4

examination revealed tenderness and stiffness in Lugo's lumbar spine, with a normal range of motion in her lower extremities, and Dr. Javed diagnosed Lugo with fibromyalgia, morbid obesity, and osteoarthritis of the lumbar spine. (*Id.* at 313, 316)

Lugo continued to see Dr. Kapur, Dr. Javed, and Dr. Alvarado through the relevant time period, and their examination findings were largely stable. Dr. Kapur's records described minimal to moderate tenderness in the lumbar spine and full strength in the lower extremities through January 2019. (*See, e.g.*, D.I. 18-2 at 118, 120, 123, 163, 165, 173, 175) Dr. Alvarado's records confirmed no neck or joint pain and a normal range of motion. (*See, e.g.*, D.I. 18-2 at 199, 203, 213, 216, 228) Dr. Javed indicated that Lugo periodically experienced worsening myalgias and fatigue, but Lugo denied joint pain, joint swelling, morning stiffness, weakness, cramps, or shooting pain in her extremities. (*See, e.g.*, D.I. 18-1 at 315, 403, 407) Lugo consistently exhibited a normal range of motion in her extremities and some tenderness in her lumbar spine. (*Id.* at 316, 403) Treatment for Lugo's low back pain included pain medication and injections, as well as a referral to physical therapy in 2018. (*See, e.g.*, D.I. 18-2 at 121, 129; D.I. 18-1 at 487-536) Dr. Kapur attempted to perform a discogram in February 2017, but Lugo could not tolerate the procedure due to pain. (D.I. 18-2 at 161)

### 2. Medical opinions

In April 2016, prior to Lugo's amended alleged disability onset date, a state agency physician reviewed Lugo's medical records and opined that she was capable of performing a range of light work. (D.I. 18 at 89) The state agency physician observed that Lugo had no issues with her personal care, and she was able to care for her grandchildren and perform activities of daily living independently. (*Id.* at 81-82) Because Lugo's impairments caused only mild to moderate restrictions, the state agency physician opined that Lugo was capable of performing her

past relevant work as a housekeeping manager. (*Id.* at 89) In February 2017, a second state agency physician reviewed the evidence and reaffirmed the recommendation of a light residual functional capacity ("RFC"). (*Id.* at 115)

Dr. Irwin Lifrak conducted a consultative exam on January 24, 2017. (D.I. 18-1 at 320-26) He noted that Lugo maintained a normal gait but had a mild limp favoring her left side, reduced range of motion and muscle spasms in her lumbar region, and lowered sensation on the plantar surface of her left foot. (*Id.* at 322-23) Dr. Lifrak diagnosed Lugo with degenerative joint disease and possible disc damage, diabetes, hypertension, anxiety, and depression, but he found she retained full strength and had no atrophy, wasting, or joint effusion. (*Id.* at 322-24) Based on these findings, Dr. Lifrak opined that Lugo was capable of sitting and standing for six hours out of an eight-hour workday without the aid of an assistive device and found she could lift up to ten pounds frequently. (*Id.* at 324)

Dr. Alvarado completed a form in September 2017 opining that Lugo would be unable to work for six to twelve months. (D.I. 18-1 at 359) In September 2019, Dr. Alvarado opined that Lugo's depression and anxiety limited her ability to function, and Lugo could sit less than two hours and stand for about two hours in an eight-hour workday. (*Id.* at 563) Dr. Alvarado predicted that Lugo would be off task for approximately twenty percent of a typical workday and Lugo was likely to be absent from work about four days per month. (*Id.* at 565)

### C. Hearing Before the ALJ

#### 1. Lugo's Testimony

During the February 6, 2019 hearing before the ALJ, Lugo testified that she lives with the parents of a friend, she has a twelfth-grade education, and she is able to understand, speak, read, and write English. (D.I. 18 at 56-57) She testified that she worked as a housekeeping manager

6

until 2013. (*Id.* at 59-60)

Lugo described how she experiences constant low back pain with numbness that extends into her legs. (D.I. 18 at 60-61) She represented that her pain is still seven or eight out of ten even when she takes gabapentin, Flexeril, and Percocet. (*Id.* at 61) She also reported that the medications make her sleepy. (*Id.*) According to Lugo, physical therapy and injections only temporarily relieve her lower back pain. (*Id.* at 61-62) Lugo also testified about her neck pain, which causes stiffness in her shoulders and results in debilitating migraine headaches. (*Id.* at 62) Lugo attributed her lower back pain and her neck pain to her diagnosis of fibromyalgia. (*Id.* at 62-63)

Lugo testified that she cleans her bedroom, her bathroom, and the kitchen area about once a week. (*Id.* at 67) She can dress and bathe herself independently. (D.I. 18 at 68-69)

### 2. Vocational Expert Testimony Before the ALJ

At the administrative hearing in February 2019, the ALJ posed the following hypothetical to vocational expert ("the VE"):

> What I would like you to do is to assume an individual of claimant's age, education, and work history who can perform work at the light exertional level; who can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; who can occasionally balance, stoop, kneel, crouch, and crawl; who can have occasional exposure to extreme cold vibration and hazards; and who can perform simple, unskilled tasks with no fast pace or strict production requirements with occasional changes in the work setting; and occasional interaction with the public. Could this person perform the claimant's past work?

(D.I. 18 at 72) In response to the ALJ's hypothetical, the VE testified that such a hypothetical individual would not be able to perform Lugo's past work as a housekeeping manager. (*Id.*) However, the VE indicated that such a hypothetical individual could work as a sorter, a router, or an inspector in the light exertional category. (*Id.*) The ALJ then asked the VE if these positions would still be available to a hypothetical individual who would be off-task fifteen

7

percent or more of the workday, and the VE responded that there would be no work in the national economy for such an individual. (*Id.* at 72-73)

In response to questioning by Lugo's counsel, the VE testified that a hypothetical individual who is consistently absent at least one day per month would not be able to maintain employment. (D.I. 18 at 73) The VE also explained that the hypothetical individual's ability to lift less than ten pounds frequently and ten pounds occasionally would not preclude all work, but it would reduce the number of sorter, router, and inspector positions available by about fifty percent. (*Id.* at 74) According to the VE, a hypothetical individual who was limited to standing and walking for two hours in an eight-hour workday would be precluded from all work at the light exertional level. (*Id.* at 75)

### D. The ALJ's Findings

Based on the medical evidence in the record and the testimony by Lugo and the VE, the ALJ determined that Lugo was not disabled under the Act for the relevant time period from the June 7, 2016 disability onset date through the hearing date. (D.I. 18 at 28-41) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since June 7, 2016, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; obesity; major depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

8

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; can have occasional exposure to extreme cold, vibration, and hazards; and can perform simple, unskilled tasks, with no fast pace or strict production requirements, with occasional changes in the work setting, and occasional interaction with the public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 7, 1966, and was 50 years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 7, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(D.I. 18 at 30-40)

## II.   STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 839

9

F. App'x 684, 687 (3d Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "more than a mere scintilla" of evidence. *Id.*

## III. DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. 42 U.S.C. § 1382(a). A disability is defined for purposes of SSI and DIB as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if the impairments are so severe that they preclude a return to previous work or engagement in any other kind of substantial gainful work existing in the national economy. *Id.* at § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§

10

404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* at §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* at §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* at §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See id.* at §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See id.* at §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC "measures the most she can do despite her limitations." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal quotations and alterations omitted). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude an adjustment to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments,

11

age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

### B. Whether the ALJ's Decision is Supported by Substantial Evidence

Lugo challenges the ALJ's decision in three respects: (1) the ALJ failed to pose a hypothetical question to the VE that comprehensively described all of the credibly established impairments causing Lugo's low back pain; (2) the ALJ failed to identify Lugo's fibromyalgia diagnosis as a medically determinable impairment; and (3) substantial evidence does not support the ALJ's RFC assessment that Lugo has the capacity to perform light work. (D.I. 21 at 1)

#### 1. Assessment of Lugo's spine impairment

Lugo contends that the ALJ erred by focusing solely on her degenerative disc disease of the lumbar spine and ignoring her symptoms caused by other diagnosed impairments that exacerbated her pain, such as sacroiliitis, osteoarthritis, and myalgias. (D.I. 21 at 11-12) In particular, Lugo argues that the ALJ disregarded Dr. Kapur's treatment notes regarding Lugo's sacroiliitis diagnosis, the diagnostic testing results, and Dr. Bose's reports. (*Id.* at 12-15)

In response, the Commissioner alleges that the symptoms associated with Lugo's diagnoses of sacroiliitis and osteoarthritis were encompassed within the ALJ's consideration of degenerative disc disease more broadly, and Lugo's complaints of myalgias were sporadic and of limited duration. (D.I. 24 at 13-14) The Commissioner further contends that Dr. Bose's records are not relevant to Lugo's claim because he treated Lugo prior to her disability onset date. (*Id.*)

The ALJ's failure to classify Lugo's sacroiliitis, osteoarthritis, and/or myalgias as severe impairments at step two of the sequential analysis does not amount to reversible error. "Because

a showing of any severe impairment at step two moves the claimant forward to step three, an ALJ who errs by not finding a specific severe impairment at step two does no harm." *Globis v. Saul*, 2021 WL 1214528, at *3 (W.D. Pa. Mar. 31, 2021). Here, the ALJ determined that Lugo's degenerative disc disease, obesity, depression, and anxiety satisfied step two and proceeded to the subsequent steps of the analysis. (D.I. 18 at 30) Accordingly, "any error at Step Two would not alter the remainder of the five-step process, much less the overall outcome." *Orr v. Comm'r of Soc. Sec.*, 805 F. App'x 85, 88 (3d Cir. 2020) (citing *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019) ("Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless.")).

Lugo emphasizes that the ALJ must nonetheless incorporate all credibly established limitations into the hypothetical question. (D.I. 21 at 12) But the ALJ's RFC assessment sufficiently incorporates the impairments associated with all of Lugo's conditions affecting her lower back and lower extremities. *See Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" (quoting SSR 96-8P, at *5)). The symptoms of Lugo's sacroiliitis overlap with the limitations caused by Lugo's severe degenerative disc disease of the lumbar spine. *See Deborah T. v. Comm'r of Soc. Sec.*, 2018 WL 6477993, at *2 (D. Md. 2018) (concluding that the plaintiff's complaints of rheumatoid arthritis, cervical and lumbar stenosis, and multiple body arthralgias "overlap in terms of their symptoms with the impairments deemed severe by the ALJ," such as degeneration of the cervical and lumbar spine). As indicated at n.4, *supra*, sacroiliitis is characterized by pain in the lower back that can extend down one or both legs. The record shows that Dr. Kapur treated Lugo for the same symptoms of low back and bilateral leg pain between September 2015 and February 2016

prior to her diagnosis with sacroiliitis. (D.I. 18-1 at 187, 191, 195, 200, 205, 210) Dr. Kapur periodically added the diagnosis of sacroiliitis beginning in May 2016 based on his findings of occasional tenderness in the right SI joint and right positive Gaenslen's and Patrick's tests,[5] but Lugo's complaints of low back pain and bilateral leg pain remained consistent. (D.I. 18-2 at 118-19, 133-34, 180-81) Both before and after her diagnosis of sacroiliitis, Lugo described her pain as constant, throbbing, shooting, stabbing, and sharp, and she consistently indicated the pain was made worse by walking and prolonged standing. (*Id.*; D.I. 18-1 at 187, 191, 195, 200, 205, 210) Lugo emphasizes that her "low back and lower extremity symptoms were a two-fold impairment," but she fails to identify any further functional limitations caused by her impairments beyond those already assessed by the ALJ. (D.I. 21 at 13)

      The ALJ's decision confirms that he considered all of the medical evidence pertaining to Lugo's impairments in determining her RFC, including symptoms more closely associated with sacroiliitis such as "pain and numbness extending down her right leg and reports that her legs give out at times." (D.I. 18 at 33-34) The ALJ's decision also expressly acknowledges the injection Lugo received in her right SI joint in May 2016 and extensively cites to the treatment records diagnosing Lugo's sacroiliitis and recommending the injection. (*Id.* at 34; D.I. 18-2 at 179) Consequently, the ALJ did not err in his assessment of Lugo's credibly established limitations. *See Wirth v. Saul*, 2020 WL 1303448, at *3 (M.D. Fla. Mar. 19, 2020) (finding ALJ

---

[5] The Gaenslen's and Patrick's tests are pain provocation tests used to diagnose patients with sacroiliac joint dysfunction. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7646135/. The balance of the treatment notes from Dr. Kapur's office covering a majority of the period between 2016 and 2019 indicated objective findings of no tenderness in the right SI joint and negative Gaenslen's and Patrick's tests. (D.I. 18-2 at 135-60, 163-78) Contrary to Lugo's representations that "Dr. Kapur maintained Ms. Lugo's diagnosis of sacroiliitis from 2016 to 2019," the record reflects that Dr. Kapur frequently did not include a diagnosis of sacroiliitis in his treatment notes during this period. (D.I. 21 at 13) Indeed, from October 2016 to January 2017, Dr. Kapur did not include sacroiliitis among Lugo's diagnosed conditions. (D.I. 18-2 at 163-70, 173)

14

adequately considered the plaintiff's sacroiliitis despite his finding that only the plaintiff's degenerative disc disease constituted a severe impairment).

Lugo also argues that the ALJ erred in failing to consider the treatment notes from Dr. Bose between February and May 2016, which further supports Dr. Kapur's diagnosis of sacroiliitis. (D.I. 21 at 14-15) The ALJ's decision confirms that he did consider Dr. Bose's records, noting that Lugo's March 2016 EMG results were normal. (D.I. 18 at 33) To the extent that Dr. Bose's records contain evidence of Lugo's sacroiliitis that was not expressly considered by the ALJ, Lugo acknowledges that this evidence "support[s] Dr. Kapur's diagnosis of sacroiliitis[.]" (D.I. 21 at 14) For the reasons set forth in the preceding paragraphs, the ALJ's consideration of this evidence was sufficient and Lugo failed to establish additional limitations beyond those considered by the ALJ in connection with the conditions of her lower back and lower extremities. In addition, Dr. Bose's treatment records predate Lugo's alleged onset date of June 7, 2016. (D.I. 18-1 at 215-25) Courts within the Third Circuit have recognized that an ALJ is not obligated to find evidence prior to the onset date to be relevant or probative. *See Masarik v. Berryhill*, 2019 WL 1099803, at *4 (W.D. Pa. Mar. 8, 2019); *Chestnut v. Berryhill*, 2018 WL 1243722, at *3 (E.D. Pa. Mar. 8, 2018) (citing *Giese v. Comm'r of Soc. Sec.*, 251 F. App'x 799, 804 (3d Cir. 2007)).

### 2. Assessment of Lugo's fibromyalgia

Lugo also challenges the ALJ's conclusion that her fibromyalgia was not a severe medically determinable impairment, despite evidence of her widespread pain and symptoms. (D.I. 21 at 15) According to Lugo, the ALJ erred in considering only Dr. Javed's treatment records and failing to consider other assessments and evidence supporting her diagnosis of

15

fibromyalgia, including evidence establishing her joint pain, stiffness, chronic fatigue, and diffuse myalgias affecting her low back, hands, neck, shoulders, and chest. (*Id.* at 15-17)

In response, the Commissioner argues that a physician's diagnosis of fibromyalgia is not, in itself, sufficient to establish the condition as a medically determinable impairment. (D.I. 24 at 15) Because Lugo's medical records do not establish a history of widespread pain in all quadrants or repeated episodes of six or more fibromyalgia symptoms, the Commissioner argues that Lugo does not satisfy the criteria of Social Security Ruling 12-2p ("SSR 12-2p"). (*Id.* at 17)

SSR 12-2p provides "guidance on how we develop evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how we evaluate FM disability claims and continuing disability reviews under titles II and XVI of the Social Security Act." SSR 12-2p, 2012 WL 3104869 (July 25, 2012). Fibromyalgia "is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p. Under SSR 12-2p, a claimant must present evidence sufficient to exclude other disorders which may cause similar symptoms, and the evidence must satisfy one of two sets of criteria for the diagnosis as established by the American College of Rheumatology ("ACR"). *Id.* At issue in this case are the 2010 ACR Preliminary Diagnostic Criteria,[6] which require a showing of: (1) a history of widespread pain in all quadrants of the body that has persisted for at least three months; (2) a showing of repeated manifestations of six or more fibromyalgia symptoms or co-occurring conditions; and (3) evidence that other disorders which could cause the symptoms were excluded. *Id.* "Conclusory

---

[6] These criteria are identified at § II.B of SSR 12-2p. Despite citing to § II.A of SSR 12-2p in her opening brief, Lugo does not address the requirement of at least 11 positive tender points on physical examination included in the 1990 ACR Criteria for the Classification of Fibromyalgia at § II.A of SSR 12-2p. (D.I. 21 at 16)

statements by a medical provider that a patient suffers from fibromyalgia are insufficient to meet a claimant's burden at step two for establishing a medically determinable impairment[.]" *Fox v. Comm'r of Soc. Sec.*, 2020 WL 1888251, at *5 (D.N.J. Apr. 16, 2020).

In the present case, the ALJ found that Lugo's fibromyalgia did not amount to a severe medically determinable impairment at step two of the analysis because "the record does not document widespread pain throughout all quadrants of the body, and there is no evidence of repeated manifestations of six or more fibromyalgia symptoms, signs or co-occurring conditions as required in SSR 12-2p." (D.I. 18 at 31) Substantial evidence supports the ALJ's decision because the medical record suggests that Lugo did not have a history of pain in all quadrants of the body and axial skeletal pain that persisted for at least three months. SSR 12-2p, 2012 WL 3104869, at *2. Instead, Lugo's pain was mostly limited to her lumbar spine and lower extremities.[7] (D.I. 18-1 at 312, 316, 413) In September 2017, Lugo experienced joint pain and soreness in her hands, but she denied myalgias and an exam revealed no tenderness in her spine at that time. (*Id.* at 411-12) The following month, Lugo complained of lumbar joint pain and diffuse myalgias again, but her lumbar spine was nontender on examination and her hands were normal. (*Id.* at 409) From March to October 2018, Lugo exhibited tenderness in her lumbar spine and the middle finger joint of her right hand, with no specific findings of pain or tenderness in her upper left quadrant during that time. (*Id.* at 403-07)

In addition, the record does not support a finding of repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions. SSR 12-2p describes these manifestations to include "somatic symptoms" such as

---

[7] Lugo's complaints of myalgias, joint pain, and lumbar tenderness were not consistently present throughout the relevant time period. (D.I. 18-1 at 411, 413, 415, 417)

17

> muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.

SSR 12-2p, 2012 WL 3104869, at *3 n.9. Lugo's medical records establish repeated manifestations of four of these symptoms, at most: muscle pain, fatigue, depression, and nervousness or anxiety. Dr. Javed's records identify numerous instances of diffuse myalgias, or muscle pain. (D.I. 18-1 at 403-09) Instances of fatigue were noted on two occasions by Dr. Javed, and Dr. Lifrak also observed decreased energy and motivation on several occasions. (*Id.* at 403, 407, 551-53, 557-59) Dr. Lifrak also repeatedly indicated that Lugo struggled with anxiety and depression during the relevant time period. (*Id.* at 552-53, 557-59)

The record otherwise contains one instance each of insomnia and dizziness. In a treatment record from June 2018, Dr. Lifrak noted that Lugo suffered from insomnia. (*Id.* at 559) The balance of Dr. Lifrak's treatment notes and all of Dr. Javed's records suggest that Lugo did not continue to suffer from insomnia during the relevant time period. (*Id.* at 312, 315, 403-17, 554-58) In July 2018, Dr. Javed described a single instance when Lugo experienced a fall as a result of dizziness. (D.I. 18-1 at 405) Consequently, Lugo's dizziness and insomnia do not satisfy the "repeated manifestation" requirement under SSR 12-2p. Lugo suggests in her briefing and testimony that she experienced numbness in her legs (D.I. 21 at 17; D.I. 18 at 60-61), but this symptom is not supported by her medical records. In fact, Dr. Kapur consistently reported that Lugo experienced "[n]o numbness or weakness of extremities" throughout the relevant time period, including in the weeks preceding the hearing before the ALJ. (D.I. 18-2 at 118, 120, 122, 124, 126, 128, 130, 133, 135, 137, 139, 141, 143, 145, 147, 149, 151, 153, 155,

157, 159, 163, 165, 167, 169, 171, 173, 175, 177) Lugo fails to cite to medical records establishing the existence of any of the remaining somatic symptoms. Based on this record, substantial evidence supports the ALJ's conclusion at step two of the sequential evaluation that Lugo's fibromyalgia is not a severe medically determinable impairment. *See* SSR 12-2p, 2012 WL 3104869, at *3.

### 3. Lugo's capacity to perform light work

Lugo contends that the medical evidence regarding her ability to stand, walk, lift, and carry does not support the ALJ's RFC finding that she has the capacity to perform light work. (D.I. 21 at 18-19) According to Lugo, the ALJ did not explain why he disregarded medical records, diagnostic tests, and objective findings establishing that she cannot satisfy the light work requirements. (*Id.* at 19) The Commissioner responds that the ALJ considered all of the relevant evidence in determining Lugo's RFC for a range of light work, and substantial evidence supports his conclusion that Lugo's MRI results, examination findings, and conservative treatment revealed only mild limitations. (D.I. 24 at 18-19)

The ALJ's RFC finding limiting Lugo to a range of light work is supported by substantial evidence. Specifically, the ALJ's RFC finding is supported by objective test results showing stable, mild findings in Lugo's lumbar spine and medical records establishing that Lugo pursued a conservative treatment regimen of physical therapy and pain management for the pain in her back and lower extremities. (D.I. 18 at 33-34, 37; D.I. 18-1 at 222, 229, 267; D.I. 18-2 at 118, 177) The ALJ's RFC determination is also supported by the consultative exam findings of Dr. Lifrak and the opinions of the state agency physicians, who found that Lugo was capable of performing a range of light work. (D.I. 18 at 89, 115; D.I. 18-1 at 320-26) Because the ALJ's RFC determination is supported by substantial evidence, the decision is affirmed. *See Gaddis v.*

19

*Comm'r of Soc. Sec.*, 417 F. App'x 106, 107 n.3 (3d Cir. 2011) ("Where the Commissioner's findings of fact are supported by substantial evidence, courts are bound by those findings even if they would have decided the factual inquiry differently—*i.e.*, we are not permitted to weigh the evidence or substitute our own conclusions for those of the fact-finder.").

## IV. CONCLUSION

For the foregoing reasons, Lugo's motion for summary judgment (D.I. 20) is DENIED, and the Commissioner's cross-motion for summary judgment (D.I. 23) is GRANTED. An Order consistent with this Memorandum Opinion shall issue.

Dated: February 7, 2022

Sherry R. Fallon
United States Magistrate Judge